THE CITY OF OKLAHOMA CITY v. HILL BROTHERS.

(Filed July 30, 1897.)

1. TOWNSITE TRUSTEES—*When Deed Void.* Townsite trustees appointed under the act of congress of May 14, 1890, had no power to execute a deed to undisposed of lots in a townsite to the city for public use as a site for public buildings, while applications of persons for deeds, by virtue of occupancy, were pending; and where it appears that a deed was made while an appeal was pending from a decision of the townsite trustees, adverse to the applicants, and before the final decision in the case was made by the secretary of the interior, and prior to an order of the secre-

Oklahoma City v. Hill Bros.

tary of the interior, or any action tantamount thereto, setting aside the lots for public use as a site for public buildings, a deed to the lots made by the trustees to the city for such purposes is held void.

2. TOWNSITE—*Undisposed of Lots—Public use of City.* Under the provision of the townsite law which allows a city to acquire undisposed of lots for public use as sites for public buildings, the city acquires no right to the use and occupancy of the lots until the secretary of the interior has directed that the lots be reserved for such purpose for the city, or has executed a proper conveyance, or directed it to be executed by the townsite trustees to the city for such purposes.

3. ACT OF MARCH 2, 1889—*Peaceable Possession of Lots—Action for Trespass Lies Against Wrong-Doer.* A provision of the act of congress of March 2, 1889, opening the Oklahoma lands to settlement, is that: "Until said lands are opened for settlement by proclamation of the president, no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall ever be permitted to enter any of said lands or acquire any right thereto;" and it is held that parties who entered the lands in violation of this act, and had settled upon and occupied lots upon a government townsite for townsite purposes, and made improvements thereon, and who were unlawfully dispossessed while in the peaceable and actual occupancy of the buildings on the lots, by the authorities of the city, which had no right to, or interest in, the lots, can maintain an action for damages for the trespass. Peaceable possession of the premises, although without right, is sufficient title to maintain trespass against a wrong-doer who, without a better right, intrudes upon such possession.

4. CONSPIRACY—*Instruction.* An instruction to the jury authorizing a recovery by plaintiffs for damages for trespass in case the jury found that defendant and others had entered into a conspiracy to forcibly and unlawfully dispossess plaintiffs from their peaceable possession of real estate, where the petition on which the case was tried did not charge a conspiracy, is held not to have been reversible error; all the elements necessary to entitle the plaintiffs to a recovery existed in such case independently of any conspiracy, and as plaintiffs' recovery was not made more easy on account of such instructions, or the damages increased thereby, no injury was done the defendant.

5. TORTS—*City's Liability For.* While cities are not liable for the torts of their officers committed in the exercise of governmental pow rs delegated to a city as an agency of the state, unless the liability is imposed by statute, they are liable for the torts of their officers committed in the exercise of some power concerning which they are authorized to act by law, or by the charter of the city for the private or corporate benefit of the city.

6. TRESPASS—*Liability*. And if the officers of a city commit a trespass in acquiring possession of real estate, which the city might acquire in a lawful manner, and by lawful means, and to which the city was then claiming title under a void deed, and which trespass is ratified by the city by the acceptance of the benefits of the trespass, the city is liable for all the damages which are the natural result of the trespass, including damages to furniture and stock used in the business on the premises, and the loss of profits.

7. TRESPASS—*Damages—Conversion*. Where the plaintiffs in an act'on for damages for trespass tried their case on the theory that plaintiffs were entitled to recover the rental value of the buildings on the lots, of which the plaintiffs had peaceable possession, without title, and the case was not tried on the theory that they could recover the value of the buildings, and the court instructed the jury that the measure of plaintiffs' damages, other than those to personal property and profits of business, was the rental value of the premises, and plaintiffs saved no exceptions to the instructions, it is held that the general verdict cannot include the amount which the jury may have allowed for the conversion of the buildings, to augment the amounts allowed in their special findings for rent.

8. TRESPASS—*Damages—Measure of—Action—Possession*. The rental value of the premises during the time the party is forcibly and unlawfully kept out of possession is the proper measure of damages, and it is not necessary to such recovery that the party entitled thereto should have regained his possession. The code provides a plain civil action to redress the injury done, and this does not depend upon whether the one pursuing it is in or out of possession.

9. LIMITATION OF RECOVERY. Nor in such an action is the recovery of rents limited to the time the action is brought, but it may be extended up to the time of the verdict, and this rule is not affected by sec. 2638, which provides: "The detriment caused by the wrongful occupation of real property, in cases not embraced in secs. 2639, 2645, 2646 and 2648, is deemed to be the value of the use of the property for the time of such occupation, not exceeding six years next preceding the commencement of the action or proceeding to enforce the right to damages, and the costs, if any, of recovering the possession." This section limits the period before the action for which the recovery may be had, but not subsequent thereto.

10. TOWNSITE—*Lots Set Apart for Use of City*. The right of a city to use and occupy lots in a government townsite attaches from the time the secretary of the interior directs that the lots be set apart or reserved for public use as sites for public buildings of the city, and it is held that rents as damages by an occupant

thereof unlawfully dispossessed by the city, could only be re-
covered to the time of the secretary's order that the lots be
reserved for such public use, and not to the time the city re-
ceived the trustees' deed to the lots, made in pursuance to
such order.

(Syllabus by the Court.)

*L. M. Keyes, City Attorney, R. G. Hays* and *H. H. How-
ard,* for plaintiff in error.

*Amos Green & Son,* for defendants in error.

*Error from the District Court of Canadian County; before
John C. Tarsney, District Judge.*

STATEMENT OF FACTS.

Action for damages for trespass. Judgment was had
for plaintiffs for the sum of $11,040.50, from which de-
fendants appeals.

This case grows out of an alleged forcible entry by the
city of Oklahoma City, through its officers, upon lots 40
and 41, in block 23, in the city of Oklahoma City. The
forcible entry and detainer case brought by the Hills was
before this court and decided in 4 Okla. 521, where many
of the facts of the case are stated. This case was brought
as an action for damages, and was filed in the district
court of Oklahoma county on the 29th day of December,
1893. A change of venue was taken in the case to Cana-
dian county on account of the alleged bias and prejudice
of the people of Oklahoma county against the plaintiffs.
Two amended petitions were filed. The original and
first amended petitions made the mayor of the city, three
councilmen and the police judge defendants with the city
in the case, and charged a conspiracy and combination
with W. S. Field, who, it appears, was employed as an

attorney for the city, Frank McMasters, R. E. Kelley and John Fightmaster, sheriff of Oklahoma county and his deputies, with others, to .forcibly, illegally and wrongfully oust the plaintiffs from these lots and the buildings thereon, and obtain possession thereof for the city. The trial was had on the second amended petition, and this laid the action against the city of Oklahoma City alone, and omitted the charge of conspiracy contained in the former pleadings, and alleged that plaintiffs were, on the 31st day of October, 1893, in the lawful and peaceable possession of the lots, and the buildings and improvements thereon, which they had erected at a cost of four thousand dollars, and that they had occupied these lots ever since the 23rd day of April, 1889, and that their occupancy was under claim of right as settlers upon and occupants of said lots for townsite purposes. That on the 31st day of October, 1893, the defendant, the city of Oklahoma City, through and by its officers, unlawfully and forcibly entered upon the lots and took possession of the same, ousted plaintiffs therefrom, and broke up and destroyed their business, which was that of a saloon business, in which they were engaged in the saloon building on the front end of one of the lots, it being the lot on the corner of the block in which these lots were located.

This petition contained three counts for damages: First, for the rental value of the lots; second, for the recovery of the buildings or the value thereof; and third, for damages sustained on account of loss of stock and injury to their furniture and fixtures, and loss of profits of their business, the entire sum sued for amounting to $35,000.

The defendant answered in nine paragraphs, in the first seven of which it admitted its corporate existence, and that the lands were public lands of the United States on April 22, 1889, and were on that day settled upon for townsite purposes, and have since been used by virtue of the townsite laws of the United States for townsite purposes, and that plaintiffs on said 22nd day of April, 1889, settled upon and improved these lots, and occupied the same until October 31, 1893; and denied the alleged trespass, or that the plaintiffs had suffered any damages.

In the eighth paragraph defendant alleged that the plaintiffs did, in violation of the laws of the United States and a part of the provision contained in the acts of congress of March 1 and 2, 1889, enter the Territory of Oklahoma and occupy a portion of the Oklahoma lands subsequent to the president's proclamation and prior to twelve o'clock, noon, of April 22, 1889, and that by such act the plaintiffs were disqualified from occupying any of said lands or acquiring any rights therein, and on the 3rd of September, 1890, the trustees, duly appointed by the secretary of the interior for that purpose, did make entry of the lands occupied as a townsite at Oklahoma City, and of which these lots were a part; that plaintiffs made application for a deed to these lots, and that other parties also applied for deed thereto, and that the townsite trustees, upon the trial, held that the plaintiffs were disqualified from acquiring title to said lots by reason of their aforesaid unlawful entry into the Oklahoma country and upon these lots and that there being no other occupants of the lots and the same being vacant for want of a legal occupant, the lots should be set aside for the use and benefit of the defendant, the city of Oklahoma City,

and that in pursuance of this decision, on the 18th day of October, 1893, the townsite board executed, acknowledged and delivered its deed to the defendant for these lots, and that it has since been the legal and equitable owner thereof. That plaintiffs appealed from this decision of the townsite trustees to the commissioner of the general land office, and the commissioner of the general land office affirmed the decision of the trustees, from which ruling the plaintiffs appealed to the secretary of the interior, who affirmed the decision of the commissioner of the general land office, set aside the said lots to the defendant as a site for public buildings, and caused the townsite trustees to execute to defendant a second deed for that purpose.

The ninth paragraph alleged that the plaintiffs, on the 31st day of October, 1893, were conducting a saloon business in the corner room of said buildings, and in a room immediately above the saloon were conducting a gambling buisness, and that the room upstairs was connected with the saloon room by an open stairway on the inside of the building, and that on said day a complaint, under oath, was filed with one J. W. Davis, a justice of the peace in and for the city, charging the plaintiffs with a violation of the laws of the Territory in conducting said unlawful business of gambling, and also a complaint under oath was made before said justice charging plaintiffs with keeping blinds at the windows of said saloon, where intoxicating liquors were sold, in violation of law, and also keeping a billiard table in the same room where intoxicating liquors were sold. That warrants were issued upon these complaints to the sheriff of Oklahoma county, commanding him to arrest plaintiffs and all persons in

their employ engaged in conducting such unlawful business, and to seize and take into his possession "all of the gambling devices and paraphernalia contained in said room, used by plaintiff for gambling; also all liquors and vessels containing the same, and all furniture pertaining to said saloon business of the said plaintiffs of every nature and description," and that the sheriff executed these warrants and left the corner room of the building and upstairs vacant and unoccupied, and defendant thereafter finding the building vacant and unoccupied went peaceably and quietly, without force, into the possession of said rooms and building; that defendant had nothing to do with removing said furniture from said building; and that defendant took possession thereof peaceably. During the trial of the case the court sustained a demurrer to the eighth and ninth paragraphs of this answer, to which defendant excepted.

On the trial, the testimony of the plaintiffs tended to prove that plaintiffs settled on these lots on the 22nd of April, 1889; that they erected buildings covering all the corner lot, and on the front end, and extending back about fifty or sixty feet on the next lot. That they had had sole and exclusive possession of these lots ever since soon after April 22, 1889. That they were running a saloon business in the corner building, and that the other rooms and buildings were leased to tenants. That on the morning of October 31, 1893, the sheriff arrested plaintiff Joe Hill, and his bar-keepers and attendants, and removed the stock of liquors and cigars, and his furniture and fixtures, from the building. The city marshal and several policemen had arranged to be present, and were present at the time, and immediately after, and

even during the time the sheriff was removing plaintiffs' goods and furniture, proceeded to take possession of the corner building. The plaintiffs claimed, and offered some evidence tending to prove, that the marshal and policemen assisted the sheriff in the arrests and seizure. The police judge immediately removed into the upper room where the gambling had been conducted, and held police court therein, and the city council shortly thereafter moved its chambers into this room, and that the city had ever since held possession of this building, and collected the rents from the tenants in the other buildings. That the sheriff held the goods and furniture of plaintiffs for about two months, and then delivered the same back, with part lost and destroyed, and that which was returned in a damaged condition. Proof of the amount of damage was offered.

Defendant, in support of its defense, offered in evidence the deed from the townsite board issued on October 18, 1893, which offer was denied and exceptions saved. The decision of the secretary of the interior in the case of Hill Brothers, and others, applicants for the lots, of date March 28, 1895, was offered in evidence, refused as evidence, but the court admitted it into the case on the theory that the court took judicial notice of such decision, so that this item of evidence was practically in. The defendant also offered to prove the allegations of the ninth paragraph of the answer, but this was refused, and at this time the demurrer to this paragraph was sustained, exceptions being taken to both rulings. The defendant also offered in evidence the second trustees' deed, made and executed on August 1, 1895.

The court instructed the jury, among other things, that

if the officers of the city of Oklahoma City entered into a conspiracy with the sheriff of the county and his deputies to forcibly eject plaintiffs from the property, the city was liable for the damages resulting therefrom. Also, that although the plaintiffs had entered the Oklahoma lands in violation of the act of congress of March 2, 1889, until the final determination of their application for these lots they were entitled to retain possession thereof, and could recover damages from the defendant for an unlawful dispossession, and that the measure of damages would be the value of the use of the premises from the time of the ouster to August 1, 1895, which was the date of defendant's second deed. And also for damages for injury to the stock of goods and to the furniture, and for the loss of profits, and also for the value of their liquor licenses for the remaining portion of the quarter from October 1st to December 31, 1893, the latter date being the expiration of the shortest one of plaintiffs' licenses from the government, county and city.

The defendant asked instructions that the city could not be held liable for the torts of its officers; also on the theory of the case presented by the eighth and ninth paragraphs of the answer, which were refused, and defendant saved exceptions to the instructions given, and also to those refused. Plaintiffs saved no exceptions to the instructions.

The jury found for plaintiffs in the sum of $11,040.50 and upon the special questions submitted by defendant found the items of damage to be first, for loss of business $600, second, for loss of personal property of plaintiffs $900, third, for the use of the saloon building, for the first two months, nothing, as they allowed for the loss of

profits of business for those two months, for the remaining nineteen months $2,375 and for the remaining rooms, 21 months, $3,622.50. The general verdict was for $11,040.50, which was $3,543 in addition to the items covered by the special findings.

Defendant moved for a new trial, which was overruled and exceptions saved, and to reverse the judgment rendered on the general verdict this appeal is taken. Some other facts appear in the opinion.

Opinion of the court by

BIERER, J.: Error is assigned to the action of the court in excluding from the evidence the deed issued by the townsite board on October 18, 1893, to the city of Oklahoma City. The gist of the argument contained in the brief of counsel in support of this claim is contained in the following language:

"We maintain that, the deed having been issued in due form by the trustees, holding title and clothed with an authority to convey the same, it is to be presumed that it was regularly and properly issued until the contrary is made to appear by one having a better right in a direct proceeding for that purpose."

In so far as counsel have stated the presumptions which attend the acts of the trustees in deeding lots they are authorized to convey, they have no doubt stated the law correctly. But in stating the law that should be applied to this case, they have assumed the one important factor which always controls the presumptions that attend the actions of all public officers, and that is: Did they have authority to act? If they did, and acted, then the presumption is that the action was the proper one to be taken until overcome in some appropriate manner; but if they did not possess the authority or jurisdiction to act,

then the act was void, and this may be shown in any form of action, wherever and whenever the question may arise, or a party may assert a right founded on such action.

The law on this point is correctly stated by the supreme court of California in the syllabus to the case of *Edwards v. Rolley*, 31 Pac. 267, which is as follows:

"A patent for land, the sale of which is unauthorized, may always be shown invalid by one holding adversely, although the title be that merely of naked possession."

The law, as there declared, is supported by citations from the opinions of Mr. Justice Field in *Smelting Co. v. Kemp*, 104 U. S. 636, and *Steel v. Smelting Co.*, 106 U. S. 447. And on this question Mr. Justice Miller, speaking for the supreme court of the United States, in the case of *Doolan v. Carr*, 125 U. S. 618, said:

"There is no question as to the principle that where the officers of the government have issued a patent in due form of law, which on its face is sufficient to convey the title to the land described in it, such patent is to be treated as valid in actions at law, as distinguished from suits in equity, subject, however, at all times to the inquiry whether such officers had the lawful authority to make a conveyance of the title. But if those officers acted without authority; if the land which they purported to convey had never been within their control, or had been withdrawn from that control at the time they undertook to exercise such authority, then their act was void—void for want of power in them to act on the subject matter of the patent, not merely voidable; in which latter case, if the circumstances justified such a decree, a direct proceeding, with proper averments and evidence would be required to establish that it was voidable, and should therefore be avoided. The distinction is a manifest one, although the circumstances that enter into it are not always easily defined. It is, nevertheless, a clear distinction, established

by law, and it has been often asserted in this court, that even a patent from the government of the United States, issued with all the forms of law, may be shown to be void by extrinsic evidence, if it be such evidence as by its nature is capable of showing a want of authority for its issue."

The position taken by the trial court seems to have been that the averments contained in the eighth paragraph of defendant's answer, and the opinion of the secretary of the interior, were sufficient to overcome any presumption that this deed was regularly issued, and that it was void for want of authority in the trustees to make it at the time it was made, and we think the conclusion sound.

The claim of the city to these lots is based on its rights to acquire title thereto under sec. 4 of the townsite act of congress of May 14, 1890, Oklahoma Statutes, p. 64. This section provides:

"That all lots not disposed of as hereinbefore provided for shall be sold under the direction of the secretary of the interior for the benefit of the municipal government of any such town, or the same or any part thereof may be reserved for public use as sites for public buildings, or for the purpose of parks, if in the judgment of the secretary such reservation would be for the public interest, and the secretary shall execute proper conveyances to carry out the provisions of this section."

Other sections of this act by which title may be acquired to portions of the public domain of the United States for townsite purposes, provide for the appointment of three trustees to administer the rights therein provide for, and it is the duty of these trustees, under the law and the regulations of the interior department, to make entry of lands occupied for townsite purposes, to receive applications of persons entitled to lots, to hear and determine

contests and disputes of persons claiming adversely the right to acquire title to the lots, and this section 4 makes provision for the disposition of "all lots not disposed of," as in this act provided.

It appears that plaintiffs had made application for these lots, that the trustees had decided against them, and that appeals had been taken to the commissioner of the general land office and the secretary of the interior. These appeals are provided for by regulations of the secretary of the interior, and such regulations have been held to be valid by the supreme court of the United States in *McDaid v. Oklahoma Territory*, 150 U. S. 209. The plaintiffs, then, had a right to take this appeal. Although it is not alleged at what time the appeal was taken, so as to show that it was taken within the time provided by the rules of the interior department, we must presume that it was properly taken, for the secretary passed upon the case upon its merits, thereby entertaining the appeal, and carrying with it all the presumptions of regularity.

In *McDaid v. Oklahoma*, *supra*, it is held that the trustees could not be required to make a deed pending an appeal from the decision, and manifestly also pending such an appeal they could not have made a deed to the lots. But whether or not the appeal so suspended the functions of the trustees that they were deprived of all power to make a deed pending the controversy, and any deed made by them would therefore be a nullity, it is not now necessary to determine, for the reason that an entire want of authority in the trustees to make a deed to the defendant city appears from other considerations.

The law under which defendant claims title to these

lots provides for undisposed of lots being sold by the secretary of the interior, or reserved for public purposes. The language is "That all lots not disposed of as hereinbefore provided for" shall be sold under the direction of the secretary of the interior for the municipal benefit, or reserved for public purposes, and it was the evident intention of congress that no disposition should be made of lots in a townsite to any public purpose until it was first determined whether or not there was a legal occupant thereof, and the matter of the claim of the plaintiffs to these lots was not determined until the secretary of the interior finally passed upon the case. This disposal, too, it is provided by law, shall be made "under the direction of the secretary of the interior," and the direction of the secretary of the interior to grant the application of defendant to have these lots set aside for public use for public buildings of the city of Oklahoma City was made on March 28, 1895, long after this deed was executed. Up to the time of that direction these lots were in controversy and if they had not been in controversy up to that time the city of Oklahoma City could have acquired no right therein by virtue of section 4 of the townsite act, for being lots for which there was no applicant, they might have been sold under the direction of the secretary of the interior for the benefit of the city, or they might have been reserved "for public use as sites for public buildings, or for the purpose of parks." Now, this public use did not alone contemplate the use of these lots for sites for public buildings for the city, and it was not until the direction of the secretary of the interior was made that it was known, at least in a legal way, what public purpose the lots would be reserved for, or whether they would be reserved for parks or for public buildings for

the city, or sold for the benefit of the city. It was the order of the secretary of the interior that first set aside these lots for the use of the city, and gave the city its first interest therein, and the deed in question having been made without the direction of the secretary of the interior, and without any order which contemplated this act, and the trustees having no power without such an order to execute a deed to the city to undisposed of lots, to be held and used by it for public purposes, the deed was made without authority, and was void.

It is claimed by counsel for defendant that the plaintiffs cannot recover damages for the wrongful act of the city in forcibly ejecting the plaintiffs from these lots, because they were upon the lots in violation of the act of congress of March 2, 1889, which provides that "until said lands are opened for settlement by proclamation of the president, no person shall be permitted to enter upon and occupy the same, and no person violating this provision shall ever be permitted to enter any of said lands or acquire any right thereto."

That plaintiffs did enter upon and occupy these lots in violation of this act of congress must now be held as beyond dispute, because that was the determination made by the land department in the contest proceding, of which it had jurisdiction, and where this matter was in issue, and upon which evidence appears to have been taken, and this decision is binding upon the courts. (*Johnson v. Towsley,* 13 Wall. 72; *Marquez v. Frisbie,* 101 U. S. 473.)

While, however, the plaintiffs could, by virtue of this decision of the department on this issue, never acquire any title to these lots from the government, nor any right

in or to the land, it cannot be maintained that their possession under their claim as townsite occupants gave them no right to hold that possession as against a stranger who had no title or right of possession, and such the city was, for, as we have seen, its deed of October 18, 1893, was void, and it had no other claim to the lots, and no other right of possession until its application to have the lots set aside to the city for public use as a site for public buildings was sustained on March 28, 1895. And while, by virtue of this act of congress, the plaintiffs could acquire no title or right to these lot, they did, until their disqualification was established, have some right of possession there. They had settled upon the lots. They had reduced the lots to their own sole and exclusive possession. They had erected lasting, substantial and valuable improvements upon the lots, and they were, by themselves and their tenants, at the moment of their dispossession in the actual and peaceable possession of them, using them for business purposes. And they were asserting a right to acquire title to these lots under a law of the United States, and that claim was undisposed of.

The law gives a settler upon and occupier of lots on a government townsite the right to hold possession of his occupancy against the forcible intrusion of all other persons, and although he may, by reason of his disqualification as an entryman, never be able to acquire any right to the lots beyond that which his mere naked possession gives him, this is sufficient to protect him from forcible intrusion from any and all other persons, and to give him a right of action for damages against any person who may exclude him therefrom without title or right paramount to that which the naked and peaceable possession gives the occupant.

We are not now determining what right of action for damages a party might have for a forcible ouster committed by one who showed a better right to the lots than the party forcibly ousted, or by another occupant of the lots who claimed his initiatory right prior to that of the ousted occupant, and whose right, by the subsequent acquisition of title, would relate back to a date prior to the forcible ouster. We are determining the case between one who held peaceable possession, under a claim of right to acquire title from the government as a townsite occupant and one who, at the time of the trespass, had no right whatever to the lots.

It is true, the law declares that one who enters upon and occupies these lands in violation of law shall never be permitted to enter or acquire any right to the lands, but it is not attempted to determine in advance who are, and who are not, disqualified under this law. Each and every person may occupy the lands, and when he is occupying them peaceably he is presumed to be occupying them lawfully, and this presumption obtains in his favor until it is overcome by proof, and until his disqualification is established, although he may be an illegal occupant, he has, by virtue of his peaceable possession, and his claim of right to occupy it, all the rights of a legal occupant. And although he might, after it had been held that his occupancy was in violation of law, be defeated of his right to obtain redress of one who had, without lawful process, deprived him of the use of his possession, this certainly could not be accomplished by a mere trespasser. The plaintiffs' possession, although in violation of law, as was subsequently determined, was good against the defendant, who had no right to the lots at the time of the

entry. This conclusion is upheld by every authority we have examined, and counsel have cited no text-book or decision that disputes it.

In the case of *Reed v. Price*, 30 Mo. 442, it is said:

"But if the plaintiff prove possession merely, that will suffice, if the defendant cannot show a superior right in himself or another under whom he can justify. It is true the plaintiff must prove such a lawful possession as the defendant had no right to disturb, but any possession is a legal possession against a wrong-doer."

And numerous cases are there cited in support of the decision, among which is the case of *Shrewsbury v. Smith*, 14 Pickering, 297, in which the supreme court of Massachusetts said:

"It is very clear, that a mere stranger cannot question the right of one in possession, or put him upon the proof or disclosure of his title. Nothing is more familiar than the rule, that where one brings an action against another, the plaintiff must prove a title or be nonsuited; the defendant is not to be called on to show his title. And there seems to be no reason why a stranger should be placed in a better situation, by taking the matter into his own hands, ploughing land, taking crops, or otherwise interfering with the right of the party in possession. Such a proceeding would be as contrary to sound policy as to legal principles. There are many cases, where acts have been done intended to constitute a good and valid title, where grants have been made, and titles transferred, but where, through negligence, ignorance or mistakes, especially where corporations, public bodies, and official agents are concerned, such titles cannot be legally proved. Upon a close investigation, a flaw in the title would be discovered. If a lawful owner in whom the legal title remains, chooses to interfere and set up his legal claims, the law, in consistency with its own rules in regard to the transmission of title, may be compelled to

admit his claim. But if such owner, upon considerations of propriety, equity and conscience, chooses to acquiesce, and permit the party in possession to retain that possession, notwithstanding any defect of title, by what rule of law, of equity or sound policy, can a mere stranger be allowed to interfere and by his own act violate the actual and peaceable possession of another, and thereby compel him to disclose a title, in the validity or invalidity of which such stranger has no interest?"

In the case of *Ill. & St. L. R. R. & Coal Co. v. Cobb*, 94 Ill. 55, it is given as the law that:

"A person in peaceable possession, suing for a trespass to the freehold, should never be put upon proof of his title to recover against a wrongdoer having no title."

In the case of *Todd v. Jackson*, 26 N. J. Law Rep. 525, the Chancellor stated:

"A man who is in possession of a dwelling-house has, by that possession, a title good against all the world for every purpose, until a superior one is shown; and most certainly it cannot be the law, and ought not, that such possession is not *prima facie* evidence of title against a waton wrongdoer."

The supreme court of California, in the case of *Golden Gate Mill & M. Co. v. Hendy*, 23 Pac. 45, in the syllabus of the case, states it to be the law that:

"In an action to recover damages for a trespass, the possession of plaintiff is sufficient evidence of title as against a mere trespasser."

The case of *Northern Pac. R. Co. v. Lewis*, 51 Fed. Rep. 658, was brought by plaintiffs to recover damages for the negligent burning of 9,400 cords of wood which the plaintiffs had cut, without authority or permission of the government, upon the public lands of the United States, and piled near defendant's railroad track. The railroad

company claimed that the title or ownership of the wood was in issue in the case, and that as the wood had been cut from the government land without authority, it still belonged to the United States, and the plaintiffs could not recover. In passing upon the question the circuit court of appeals for the ninth circuit held:

"This case comes within the general rule governing the action of trespass for injury to personal property. In such a case possession is *prima facie* evidence of right, and no stranger may disturb that possession without showing some authority or right from the true owner. The rule applies to the negligent destruction of property, as well as to its wrongful taking and asportation. The fact that the land on which the wood was cut was government land, and the wood, when cut and sawed, still belonged to the United States, and the fact that the defendant in error may have been trespassers, can make no difference with the application of the rule. In such a case the defendant is not allowed to justify his own wrong by showing the plaintiff's wrong, and he is not allowed to question the title of plaintiff in possession, unless he connects himself with the true title."

In the case of *Gulf, C. & S. F. Ry. Co. v. Johnson,* 54 Fed. Rep. 474, decided by the circuit court of appeals for the eighth circuit, a part of the damages recovered was for hay which was burned by fire negligently permitted to escape from defendant's locomotives, and it was claimed upon behalf of the railroad company that the title to the lands in the Chickasaw country was vested in the Chickasaw nation of Indians, and that by some law, custom or usage, the citizens of that nation of Indians had a right to the use of so much of the lands as they might occupy and improve, but that no citizen could make a valid lease of the land of which he had taken possession for a longer

period than one year, and that plaintiff was in possession of the land in question under a lease from a citizen of the nation which ran for eight years, and that for that reason the hay was the property of the Indian citizen, and not of plaintiff. The court, in a very well-considered and supported opinion, held the railroad company liable for the damage it had caused the plaintiff, saying:

"Assuming, but not deciding, that the laws and customs of the Chickasaw Nation are what the plaintiff in error claims them to be, and that the lease under which the plaintiff acquired the possession of the land was void, his right of recovery is not affected thereby. The plaintiff was in the actual peaceable possession of the land and the hay cut from it. As against a wrong-doer, possession is title. The presumption of the law is that the person who has the possession has the property, and the law will not permit that presumption to be rebutted by evidence that the property was in a third person, when offered as a defense by one who claims no title, and was a wrongdoer."

And the character of the action does not in any way affect the doctrine of the law announced by these decisions, for, under our system of practice, where the procedure is a simple civil action for the injury done, it has been held that:

"The proposition that a party in possession of real estate can maintain trespass, *quaere clausum fregit*, against a mere wrong-doer, for any injury to his possession is too well settled to be controverted." (*Nelson v. Mather*, 5 Kansas, 151.)

Our conclusion upon this branch of the case is that if the city, through its officers and agents, forcibly and unlawfully took possession of these premises of the plaintiffs on October 31, 1893, it was liable for such damages as naturally resulted from such act, and it was a question of

fact to be submitted to the jury as to whether or not the officers of the city did, in conjunction with the sheriff and his deputies, dispossess plaintiffs of their premises; and the question was submitted to the jury, and the jury found in favor of the plaintiffs.

We do not believe that any reversible error was committed by the court's instructing the jury that the city would be liable if its officers formed a conspiracy with the sheriff to forcibly and unlawfully dispossess the plaintiffs from these premises and place the city in possession of the lots and buildings. There was, indeed, no charge of this character contained in the amended petition on which the case was tried, and the matter of conspiracy was not only not in the case, but was entirely unnecessary to the plaintiffs' recovery. The city was not sued for a conspiracy, nor for damages resulting therefrom, but it was sued for damages for trespassing upon the plaintiffs' possession. The instruction given, however, did the defendant no injury. It did not make the plaintiffs' recovery any more easy before the jury, and did not authorize the jury to return damages for a conspiracy, and it does not appear that any were given by the jury on that account.

Some of the more important propositions of the case are presented with reference to the matter of damages. The liability was great, and the recovery was very large, and counsel have presented a number of interesting questions on this phase of the case.

It is asserted that the city cannot be held liable for any damages growing out of the seizure of the plaintiffs' stock and fixtures, and the removal of the same from the building, and the consequent breaking up of their liquor busi-

ness, because this was a tort, and the city, being a munici-pal corporation, cannot be held for the torts of its officers. This proposition would contain much force if presented in a case where the officers of the city were guilty of this conduct, inspired by their individual malice, or where the injury occurred in the exercise of some of the governmental powers delegated to the city as a part of the machinery of the state, and unconnected with any object of obtaining a benefit to the private corporate interests of the city. But that a municipal corporation may be held liable for the torts of its officers in certain cases is now well settled, and the rule by which the character of cases in which such liability is determined is tersely stated in the Am. & E. Enc. Law, vol. 15, p. 1141, as follows :

"So far as municipal corporations of any class, and however incorporated, exercise powers conferred on them for purposes essentially public—purposes pertaining to the administration of general laws made to enforce the general policy of the state—they should be deemed agencies of the state, and not subject to be sued for any act or omission occurring while in the exercise of such power, unless by statute, the action be given; in reference to such matters they should stand as does sovereignty, whose agents they are, subject to be sued only when the state by statute declares they may be. In so far, however, as they exercise powers not of this character, voluntarily assumed—powers intended for the private advantage and benefit of the locality and its inhabitants— there seems to be no sufficient reason why they should be relieved from that liability to suit and measure of actual damage to which an individual or private corporation exercising the same powers for purposes essentially private, would be liable."

A learned statement of the law on this question is contained in the opinion of Chief Justice Shaw, in the case of

*Thayer v. Boston,* 19 Pickering, 511, and which has been frequently cited by the courts, as follows:

"There is a large class of cases, in which the rights of both the public and of individuals may be deeply involved, in which it cannot be known at the time the act is done, whether it is lawful or not. The event of a legal inquiry, in a court of justice, may show that it was unlawful. Still, if it was not known and understood to be unlawful at the time, if it was an act done by the officers having competent authority, either by express vote of the city government, or by the nature of the duties and functions with which they are charged, by their offices, to act upon the general subject matter, and especially if the act was done with an honest view to obtain for the public some lawful benefit or advantage, reason and justice obviously require that the city, in its corporate capacity, should be liable to make good the damage sustained by an individual, in consequence of the acts thus done. It would be equally injurious to the individual sustaining damage, and to the agents and persons employed by the city government, to leave the party injured no means of redress, except against agents employed, and by what at the time appeared to be competent authority, to do the acts complained of, but which are proved to be unauthorized by law. And it may be added, that it would be injurious to the city itself, in its corporate capacity, by paralyzing the energies of those charged with the duty of taking care of its most important rights, inasmuch as all agents, officers and subordinate persons, might well refuse to act under the directions of its government in all cases, where the act should be merely complained of, and resisted by any individual as unlawful, on whatever weak pretence; and conformably to the principle relied on, no obligation of indemnity could avail them.

"The court is therefore of opinion, that the city of Boston may be liable in an action on the case, where acts are done by its authority which would warrant a like action against an individual, provided such act is done by the

authority and order of the city government, or of those branches of the city government, invested with jurisdiction to act for the corporation, upon the subject to which the particular act relates, or where after the act has been done, it has been ratified, by the corporation, by any similar act of its officers.

"That an action sounding in tort will lie against a corporation, though formerly doubted, seems now too well settled to be questioned. (*Yarborough v. Bank of England*, 16 East. 6; *Smith v. Birmingham, etc., Gas Light Co.*, 1 *Adolph & Ellis*, 526.) And there seems no sufficient ground for a distinction in this respect, between cities and towns and other corporations. (*Clark v. Washington*, 12 Wheaton, 40; *Baker v. Boston*, 12 Pick. 184.)

This case was followed and approved in *Hawks v. Charlemont*, 107, Mass. 414, and in *Sheldon v. Kalamazoo*, 24 Mich. 383, where the court used this language:

"The doctrine is entirely untenable that there can be no municipal liability for unlawful acts done by municipal authorities to the prejudice of private parties. In this respect, public corporations are as distinctly legal persons as private corporations. There are officers who are corporation agents, and there are municipal officers whose duties are independent of agency and with distinct liabilities. But when the act done is in law a corporate act, there is no ground upon reason or authority for holding that if there is any legal liability at all arising out of it, the corporation may not be answerable. There is no conflict whatever in the authorites on this head."

The cases cited by counsel for plaintiff in error are not in conflict with these we have presented, as an examination of them will disclose, for in the case of *Howell v. City of Buffalo*, 15 N. Y. 512, it was expressly held that the corporation was liable in an action of tort for the levy and collection of a void assessment made for a purpose within

the general powers of the corporation, and for which the common council had authority to have levied the assessment in the regular way.

In the case of *Philadelphia, Wilmington & Baltimore Railroad Company v. Quigley*, 21 Howard 202, the United States supreme court decided that:

"The result of the cases is, that for acts done by the agents of a corporation, either *in contractu* or *in delicto*, in the course of its business, and of their employment, the corporation is responsible, as an individual is responsible under similar circumstances. At a very early period, it was decided in Great Britain, as well as in the United States, that action might be maintained against corporations for torts; and instances may be found, in the judicial annals of both countries, of suits for torts arising from the acts of their agents, of nearly every variety."

The cases of *Peters v. Lindsborg*, 40 Kan. 654, 20 Pac. 490, *Calwell v. Boone*, 51 Iowa, 687, and *Kansas City v. Lemon*, 57 Fed. Rep. 905, which are also among the cases cited by counsel for plaintiff in error, all arose from the acts of officers done in the exercise of governmental or police powers of the city, and fell within the rule of non-liability of the municipality, under all the accepted authorities. It sufficiently appears from the authorities we have cited, that where the tort is committed by the city officers in the exercise of some power concerning which they are authorized to act by law or the charter of the city, for the private or corporate benefit of the corporation or city, and property rights of the citizen are injured, the city is liable.

Cities of this Territory have power to provide necessary rooms for their council meetings, and for the police department, and may take private property for public use,

such as for market house purposes, and they may, as we have seen, acquire lots in a government townsite for public buildings; and the defendant city did claim these lots out of which the controversy grew by virtue of a deed from the townsite board of October 18, 1893, and it was claimed by the plaintiffs that it was in an effort, though not authorized either by right in the city, or the manner of doing the act, to get possession of these lots, including the buildings thereon, that the wrong was committed. The acquisition of this property was a matter of private interest of the municipal corporation. It was a corporate benefit that it had a right to acquire in a lawful manner. And it being within he power of the city to acquire such property in a lawful manner, and by lawful means, the city is liable for the acts of its officers for the damage that has been done to private property by the unlawful acts of its officers, done for the purpose of acquiring for the city of corporate benefit, and which benefit has been acquired and accepted by the city.

The petition alleges that this trespass was committed by the city through its officers, duly chosen and empowered to act for it, and there is evidence tending to show that shortly before the date of the trespass the matter of acquiring possession of this property was before the city council; that the city council had employed Mr. Field to assist the city attorney in getting possession of this property; that the mayor had given directions to the city marshal to be present at any time they should find the property vacant by reason of the arrest of the plaintiffs and the seizure of their property by the sheriff, and to at once take possession of the buildings and hold them for the city; that the marshal and policemen were present when

the sheriff arrested one of the plaintiffs and seized the stock, furniture and fixtures; and some testimony tending to show that the city officers participated in this arrest and seizure, although the city denies doing so. The evidence also tends to show that the city moved into the building immediately after the sheriff took the stock and fixtures therefrom, and occupied a portion thereof for police offices and city council chambers, and has collected the rents for the remaining portions. The city has, therefore, taken and accepted all the benefits of the unlawful seizure of the premises, if it was unlawful. Why should it not accept the appropriate liability resulting from the same act? The premises, so far as the city was concerned, at the time it took possession of them for public purposes, was the property, because it was the possession of the plaintiffs. The city took possession thereof without resorting to any condemnation proceeding, and without any authority of law whatever for so doing. So far, indeed, as the matter of recovering for the use of these premises by and on behalf of the city is concerned, while the city had no right whatever thereto, it would, indeed, seem that the question as to whether or not the ouster was forcible or otherwise would make but little difference. And the argument of counsel on this phase of the case does not go to the extent of exempting the city from the proper measure of damages for the trespass to the realty, but it is urged to relieve the city from the recovery for the loss to the stock and fixtures and profits of business.

The claim of plaintiffs, defendants in error, is that these latter damages were merely incident to the trespass upon the realty, and that the damage accruing to the

plaintiffs therefrom resulted, and was in fact a direct re-
sult of the effort of the city to get possession of the lots
and buildings.   Based upon a state of facts we think un-
questionably the city would be liable for such tort, and
if no error had been committed in presenting the question
of the city's liability to the jury for the injury suffered
by plaintiffs in the loss to their stock, furniture and busi-
ness by the acts of the officers, committed in connection
with, and as a part of, the unlawful seizure of the real
estate, we would find no tenable objection to holding the
city liable for these damages.

The case was presented to the court by the plaintiffs on
the charge and theory that the city, by its officers, wrong-
fully arrested one of the plaintiffs, and plaintiffs' em-
ployes, and seized and removed their stock from the
building, and broke up their business, all for the purpose
of unlawfully acquiring possession of these lots and build-
ings; and that having gone into the possession without
right, the city could not defend against the liability for
the injuries to the personal property and business by
showing that these injuries were caused by acts of the
sheriff in serving processes then in his hands.

The defendant sought to show that these injuries were
caused by the sheriff in serving legal processes, and that
the city had nothing to do with them, excepting to take
advantage of the unoccupied condition of the premises
which the sheriff's arrest and seizure left them in.

Defendant in error claims that these processes in the
hands of the sheriff can be no justification whatever for
these injuries to the plaintiffs, and that the city, having
gone into possession of the buildings, is estopped from
denying its liability for all the acts that attended the
city's acquisition of these premises.

The plaintiffs had a right, no doubt, to present their case to the jury on their theory, under the allegations of their petition, but the defendant also had a right to show that some other person was liable, if any person was, for the damage to the personal property, and that its removal was justified by legal process.

Counsel for defendant in error have entirely misconstrued our decision in the case of *Oklahoma City v. Hill*, 4 Okla. 521. We there held that these complaints and warrants for the arrest of the plaintiffs, and the seizure of their stock and furniture, which are pleaded and offered in evidence here, were inadmissible because they constituted no defense; but that was an entirely different character of action from this. That was a forcible entry and detainer proceeding, for the recovery purely of the possession of the real estate. This is an action for damages, to recover for the use and occupation of that real estate, and also for injuries to personal property. In that case we said:

"The sheriff's right to arrest the plaintiffs and seize their furniture gave him no right, under the statute, to seize the building and turn it over to the possession of the city, and the city's ratification of that conduct, following so immediately, as the evidence shows, on the heels of the sheriff's forcible ouster, must make, in contemplation of law, this force of the sheriff the force of the city, for it ratified and approved it."

It was not there denied that the sheriff had a right to arrest the plaintiffs and seize their stock and furniture, but what was denied was that the sheriff had a right to seize the buildings, and the buildings, with the lots on which they were located, were the only things there sought to be recovered, and it was only the force of the

sheriff, in so far as it enabled the city to acquire and unlawful possession of the real estate, that was held to have been ratified. We did not hold that there was anything illegal in the sheriff's arresting the plaintiffs and seizing their stock and furniture, but that the city could not defend itself in that action by showing that the sheriff was clothed with process to do something else than what the process authorized, and which the jury in determining the facts, found had been done.

There is nothing in that decision which holds that the city could not defend its liability for an injury to the stock, furniture and business, by showing that the acts that caused the injury were done by the officers of the Territory under legal process. And the defendant, by the paragraph of the answer to which the demurrer was sustained, and by its evidence, sought to show that the warrants had been properly issued for the arrest of the plaintiffs and the seizure of their stock and furniture, under a charge that they had violated the liquor law in maintaining blinds at the windows of the saloon, and permitting gambling on the premises, and running billiard and pool tables in the room where liquors were sold. And it appears from the evidence of the plaintiffs that these violations of the law were openly practiced in such close connection with the liquor business as to give much ground for the charge that the law was being violated. The sheriff made the arrests, and had the warrants when the arrests were made and the goods and furniture removed, and it cropped out in the evidence that these were the charges presented against the plaintiffs, and the defendant asked one of the plaintiffs if he had not subsequently been indicted, and on being arraigned pleaded

guilty to these same charges, to which objection was made and sustained, and exceptions saved.

The defendant also asked the court to instruct the jury on the theory of the law set forth by the defense pleaded in the ninth paragraph of the answer. This instruction was refused, and exception also saved to it.

The evidence also showed that the goods, furniture and fixtures were held by the sheriff for about sixty days after their seizure, and this was the limit of the time for which the plaintiffs were allowed to recover for the loss of profits of their business, because the city license, which was the shortest of their licenses, expired at that time.

The liquor law of the Territory makes it unlawful for any dealer in intoxicating liquors to have or keep any gambling table or device, billiard or pool table in the room where liquors are sold. (Section 3165.) And also makes it the duty of liquor sellers to keep the windows and doors of their respective places of business unobstructed by screens, blinds, paints or other articles. (Section 3167.) And provides that the sheriff shall, upon view or information, and with or without warrant, apprehend any person or persons committing any of these violations, and seize all such liquors and other articles of traffic, and the utensils and furniture used in the business, and convey them before a justice of the peace or district judge within the county in which the offense may be committed. (Section 3169.) The section prohibiting the use of screens, blinds or paints upon the windows, also provides for the revocation of the license for its violation.

Now, it makes no difference, so far as this case is concerned, whether the plaintiffs were guilty of these violations of law, as would be indicated by their making such

a plea, if they did make it, or not.  The defendant alleged that complaints were filed charging these violations of law, and that warrants were issued for the arrest of the plaintiffs, and the seizure of the stock, and furniture thereunder.  If this was so, it was the duty of the sheriff to arrest the plaintiffs and seize their stock and furniture, and to do everything that it appears was done in that respect.  And the city cannot be held liable for the loss occasioned to the plaintiffs by reason of the service by the sheriff of lawful processes, no matter what the purpose of the city might have been in desiring that such arrests be made.  Of course, if there was no foundation whatever for the charges against the plaintiffs, the case might present a different aspect.  But such a plea would hardly be consistent with the plea of guilty by one or the other of the plaintiffs, and that claim is entirely inconsistent with the evidence in the case.  It is the judgment of the writer, not approved however by the other Judges, that the court erred in sustaining the demurrer to the paragraph of the defendant's answer setting up this defense, and in excluding this evidence.  This affects the case, as far as relates to damages to personal property, in the sum of $900, and damages to the business of the plaintiffs in the sum of $600.  The remaining questions in the case relate to the damage for the seizure and detention of the real estate, that is, of the lots and the buildings thereon.  The jury gave the plaintiffs $2,375 for the use of the saloon building for nineteen months, and for the remaining rooms, which was all the remaining portion of the property, for the twenty-one months from October 1, 1893, to August 1, 1895, which was the date of the second deed to the city, the sum of $3,622.50.  The jury gave the plaintiffs, in addi-

tion to these sums and damage to personal property and fixtures, and loss of profits of business, the sum of $3,543. What the $3,543 was for, does not satisfactorily appear to us. We are satisfied, however, that it was wholly unwarranted. The special findings covered all of the case as presented on the theory on which the plaintiffs tried the case to the jury, and the court instructed the jury upon, unless perhaps the instructions would have covered the cost of licenses, and a recovery could not be had on this account, because that expense would be a part of the necessary expense of the liquor business. Plaintiffs could not have conducted a liquor business without licenses, and of course when they sue for the loss of profits of their business they cannot charge for one of the necessary expenses in carrying on the business. Counsel for plaintiff in error claims that this amount may have been allowed for the value of the buildings on the lots; but the case was not tried, nor did the court instruct the jury, on the theory that the plaintiffs could recover for the conversion of the buildings. The case was tried on the theory that plaintiffs could recover for the use of the buildings and not on the theory that the plaintiffs could also recover the value of these buildings in conversion. Each of the numerous questions asked by counsel for the defense as to the value of these buildings, separate from the lots, was objected to by counsel for plaintiffs, and this evidence was excluded by the court. As the case was presented as it was by the plaintiffs, and as the plaintiffs presented no exceptions to the instructions of the court, which did not admit of the jury's finding for the plaintiffs for the value of the buildings, and having tried the case upon the theory which they did, and having accepted,

without objection, the theory upon which the court presented it to the jury, they cannot now be heard to say that the general verdict may be allowed to stand, on the theory that the excess of the general, over the special verdict is for the value of the buildings converted, and there is no other even plausible claim. The special findings contained every amount which the plaintiffs could recover. The $3,543 must, therefore, be deducted.

Plaintiff in error contends that the rental value of the premises was not the proper measure of damages; that such recovery can only be had after the plaintiffs have regained possession of the premises, and as an incident to an action in ejectment, and as the plaintiffs could not recover in such an action, because of their disqualification to ever acquire any interest in these lands, that they cannot recover this measure of damages. We think the value of the use of these premises, or the rental value thereof, during the time the plaintiffs were forcibly and unlawfully, if they were so (and the findings is in favor of the plaintiffs on this issue) kept out of the premises, is the proper measure of damages. (Sutherland on Damages. vol. 3, sec. 1015.) And it was not necessary for the plaintiffs to regain possession in order to recover for the trespass. (*Fitzpatrick v. Gebhart*, 7 Kan. 35; *Arn v. Mathews*, [Kan.] 18 Pac. 65.) Our code gives to a party a plain, simple action, called a civil action, for the redress of an injury to his property rights, and that action is afforded as a mode for recovering damages for a trespass, and entirely unconnected with any question as to whether or not the plaintiff is in or out of possession when he pursues the remedy.

It is claimed, however, that if such a measure of dam-

ages is to be applied, a recovery can only be had up to the time of the bringing of the action, and sec. 2638 of the statutes is cited in support of this theory of the law. The section provides:

"The detriment caused by the wrongful occupation of real property, in cases not embraced in secs. 2639, 2645, 2646 and 2648, is deemed to be the value of the use of the property for the time of such occupation, not exceeding six years next preceding the commencement of the action or proceeding to enforce the right to damages, and the costs, if any, of recovering the possession."

We do not construe this section to mean that plaintiffs may not recover, in an action, for rents, or the value of the premises, which may accrue subsequent to the bringing of the action and before the verdict. The limitation is upon the time preceding the commencement of the action, and not succeeding it, that a recovery may be had. We can see no reason why, by virtue of this section, a party should be held to have abandoned a claim for rents which continued to acrue by reason of the continuance of the unlawful possession of the property, after the bringing of the action, or why he should be required to bring an additional action or actions to recover the subsequent amount or amounts falling due. Such a conclusion would not be consistent with a system of practice which gives a party a plain action for the redress of the entire wrong done him, as ours does. The claim of defendant, however, has been expressly denied by the supreme court of California in the case of *Hicks v. Herring*, 17 Cal. 566, wherein it is said:

"It was different with the rents and profits. The monthly value of these was known at the institution of

proceedings. For them a claim was made, and the loss of them was a necessary consequence of the deprivation of the possession, and of necessity continued until restitution. The plaintiff could therefore properly recover for them up to the time of the verdict; for the rule is, that the proof of damages may extend to all matters up to that period which are the natural results of the previous injury. (2 Greenleaf Ev. sec. 268.)"

The period of the recovery, however, of these rents and profits, was extended by the court to too late a date. The determination by the secretary of the interior of the application of plaintiffs for these lots was made on March 28, 1895. It appears that at that time the defendant had an application pending to have these lots reserved or set aside to the city for public purposes, for the purpose of erecting buildings thereon for the use of the city, and that this application of the city was granted. That decision sustaining the application of defendant was tantamount to an order of the secretary of the interior that these lots should be reserved for public use by the city of Oklahoma City. With that decision, the rights of the plaintiffs, by virtue of their occupancy and application to acquire title to these lots, ceased, and the right of the city to use them commenced. It does not require a deed executed by the secretary of the interior or by his order to enable the municipality to use lots on a government townsite for public purposes. The use may be had, and is sufficiently authorized, when the secretary of the interior directs their being reserved for such purpose. A deed may never be made to the lots, but the public use for a specific purpose has attached by virtue of the order. It is therefore our judgment that the plaintiffs could only recover for the use of these premises down to the 28th day

of March, 1895, and the proportionate amount for the period from that time to August 1, 1895, must be deducted from the amount which the jury found due the plaintiffs on this account.

By computation we find that the jury allowed the plaintiffs $125 per month for the saloon building, and $172.50 per month for the other rooms. This, for the time from March 28th to August 1st, would amount to $1,309.83, and this deducted from the sum of $2,375 and $3,622.50 would leave a balance of $4,687.67, which is the total amount the verdict in this case can be approved for, by the writer of this opinion.

It is the belief of the writer hereof that the judgment of the court should be reversed, with directions to grant a new trial, unless the plaintiffs file a remittur of all the amount of the general verdict beyond that sum, in which event the court should enter judgment for the plaintiffs for the sum of $4,687.67, with interest from the time of the verdict, and costs, but these views of the writer are not concurred in by the majority of the court so far as pertains to the damage to personal property in the sum of $900, and for the loss of profits of business in the sum of $600, both of which items the court holds must be allowed. And the views of the writer are threfore his earnest dissent to charging these items against the city upon the record before us.

Tarsney, J., who presided at the trial of the cause in the court below, not sitting.